IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JOHN W. PORTER,                    *
                                   *
      Plaintiff,                   *
                                   *
vs.                                *    Civil Action No.08-00473-B
                                   *
MICHAEL J. ASTRUE,                 *
Commissioner of Social             *
Security,                          *
                                   *
      Defendant.                   *

## ORDER

Plaintiff John W. Porter ("Plaintiff") brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying his claim for a period of disability and disability insurance benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401 et seq.  On April 30, 2008, the parties consented to have the undersigned conduct any and all proceedings in this case.  (Doc. 16).  Thus, this case was referred to the undersigned to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636( c) and Fed.R.Civ.P. 73.  (Doc. 17).  Oral argument was waived.  Upon consideration of the administrative record and memoranda of the parties, it is **ORDERED** that the decision of the Commissioner be **AFFIRMED.**

## I.  **Procedural History**

Plaintiff protectively filed an application for a period of disability and disability insurance benefits on February 9, 2004. (Tr. 74, 75-77).  He alleges that he has been disabled since October 2, 2000, due to an injury to his left elbow with permanent ulna nerve damage.  (Tr. 158, 177-178).  Plaintiff's application was denied at the initial stage.  (Tr. 35-36).  He filed a timely Request for Hearing before an Administrative Law Judge ("ALJ"). (Tr. 48).  On October 25, 2005 and February 23, 2006, ALJ Glay E. Maggard ("ALJ Maggard") held administrative hearings.  The October 2005 hearing was attended by Plaintiff and his representative, and the February 2006 hearing was attended by Plaintiff, his representative and a vocational expert.  (Tr. 489-512, 513-537). On July 28, 2006, ALJ Maggard issued an unfavorable decision wherein he found that Plaintiff is not disabled.  (Tr. 11-32). Plaintiff's request for review was denied by the Appeals Council ("AC") on June 27, 2008.  (Tr. 7-10).  Thus, the ALJ's decision became the final decision of the Commissioner in accordance with 20 C.F.R. § 404.981.  Id.  The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.  **Background Facts**

Plaintiff was born on December 10, 1964 and was 40 years old at the time of the October 2005 administrative hearing. (Tr. 75, 489, 5139).  Plaintiff has an eleventh grade education and past relevant work ("PRW") as a mechanic, a driver, and a prep worker assisting with the laying of ceramic tile. (Tr. 170-174, 186, 207, 495-497, ).  At the October 25, 2005 administrative hearing, Plaintiff testified that he was last employed in a job re-building tractor-trailers. According to Plaintiff, he left the job re-building tractor-trailers because he injured his left arm in a work accident involving a refrigerator door for a tractor trailer. (Tr. 495-497).

Plaintiff testified that due to this injury, he has had several surgeries, and is being treated with medications and nerve blocks. (Tr. 498-499).  Plaintiff further testified that he wears his arm in a sling three or four times a week, and that the pain in his arm affects his ability to concentrate and sleep. (Tr. 499-500).  Plaintiff also testified that the medication makes him groggy and angry; however, the medication and blocks have provided him some relief, the nagging pain is gone.  Plaintiff testified that his left elbow continues to pop. (Tr. 502, 504).  Plaintiff

also testified that he suffers from depression, for which he takes Lexapro[1]. (Tr. 517-519).

With respect to his daily activities, Plaintiff testified that he is able to take care of his personal needs; however, his wife sometimes assists him with shirts that have buttons, and with tying his shoes.  Plaintiff also testified that he watches television, and talks to his daughter.  According to Plaintiff, he does not perform any household chores, does not socialize, and has little or no use of his left arm most days.  (Tr. 501-503).

At the February 23, 2006 administrative hearing, Plaintiff testified that he is seeing Dr. Raun for chronic pain and depression, and that neither have improved over the past two years. (Tr. 517-518).  According to Plaintiff, his biggest problem is nagging, agonizing pain in his arm.  (Tr. 520).

**III.** **Issue on Appeal**

    A.    Whether the ALJ erred in failing to assign determinative weight to Plaintiff's treating physician, Dr. Raun.

**IV.** **Analysis**

    A.    **Standard of Review**

In reviewing claims brought under the Act, this Court's role is a limited one.  This Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial

---

[1]Lexapro is an antidepressant used to treat anxiety and depression.  <u>See</u>, <u>www.drugs.com.</u>  (Last visited May 27, 2009).

evidence, and 2) whether the correct legal standards were applied. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986). The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (finding that substantial evidence is defined as "more than a scintilla but less than a preponderance," and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[]"). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986); Short v. Apfel, 1999 U.S. DIST. LEXIS 10163 (S.D. Ala. 1999).

**B.  Discussion**

An individual who applies for Social Security disability benefits must prove her disability. 20 C.F.R. §§ 404.1512, 416.912. Disability is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for

5

a continuous period of not less than twelve months." 42 U.S.C. §
423(d)(1)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). The Social
Security regulations provide a five-step sequential evaluation
process for determining if a claimant has proven her disability.
20 C.F.R. §§ 404.1520, 416.920.[2] See, e.g., Crayton v. Callahan,
120 F.3d 1217, 1219 (11th Cir. 1997).

In his decision, the ALJ found that Plaintiff met the insured
status through June 30, 2006, and has not engaged in work activity
since his alleged onset date. (Tr. 15). The ALJ also found that

---

[2]The claimant must first prove that he or she has not
engaged in substantial gainful activity. The second step
requires the claimant to prove that he or she has a severe
impairment or combination of impairments. If, at the third step,
the claimant proves that the impairment or combination of
impairments meets or equals a listed impairment, then the
claimant is automatically found disabled regardless of age,
education, or work experience. If the claimant cannot prevail at
the third step, he or she must proceed to the fourth step where
the claimant must prove an inability to perform their past
relevant work. Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir.
1986). In evaluating whether the claimant has met this burden,
the examiner must consider the following four factors: (1)
objective medical facts and clinical findings; (2) diagnoses of
examining physicians; (3) evidence of pain; (4) the claimant's
age, education and work history. Id. at 1005. Once a claimant
meets this burden, it becomes the Commissioner's burden to prove
at the fifth step that the claimant is capable of engaging in
another kind of substantial gainful employment which exists in
significant numbers in the national economy, given the claimant's
residual functional capacity, age, education, and work history.
Sryock v. Heckler, 764 F.2d 834 (11th Cir. 1985). If the
Commissioner can demonstrate that there are such jobs the
claimant can perform, the claimant must prove inability to
perform those jobs in order to be found disabled. Jones v.
Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999). See also Hale v.
Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v.
Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

while Plaintiff has the severe impairments of left elbow scarring, traumatic arthritis, complex regional pain syndrome, major depressive disorder and adjustment disorder with anxiety, they do not meet or medically equal the criteria for any of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, Regulations No. 4. (Tr. 15-16).  The ALJ found that Plaintiff's allegations regarding his limitations were not totally credible.  (Tr. 18).

The ALJ concluded that Plaintiff retains the residual functional capacity ("RFC") to perform a limited range of unskilled, light work, and that Plaintiff's RFC precludes him from performing any of his past work.  (Tr. 17-18, 29).  The ALJ found that Plaintiff can perform jobs that exist in significant numbers in the national economy, such as surveillance systems monitor, school crossing guard, and odd-piece checker, and that vocational expert testimony supports this conclusion. (Tr. 30-31).

The relevant evidence of record includes treatment records from William A. Crotwell, M.D..  The records dated November 15, 2000 reflect that Dr. Crotwell performed an excision of olecranon bursa and removal of rice bodies in Plaintiff's left elbow.  The pathology report on the "bursa" reflects chronic bursitis with granulation tissue reaction and fibrosis, negative for granulomata. (Tr. 234, 239).

Plaintiff  underwent an upper extremity venous evaluation on February 7, 2001, which was normal, and an upper arterial

7

evaluation on the same date which was "essentially normal."  (Tr. 235-238).  In office notes dated February 16, 2001, Dr. Crotwell observes that Dr. Hinton recommended EMG and NCV studies and a bone scan to determine if Plaintiff is experiencing RSD[3].  (Tr. 233).

In a letter dated February 19, 2001 to Dr. Crotwell, John L. Hinton, M.D., writes that Plaintiff's physical exam was normal except for his left hand, which was colder than the right, had a different color, and was pale, mottled and shiny.  He noted swelling in the left elbow, and a full range of motion otherwise in all the joints.  Plaintiff's neurologic exam was normal except for pain in the left upper extremity, and slightly decreased sensation in the ulnar nerve distribution of the left upper extremity to light touch and sharp-dull discrimination.  He diagnosed Plaintiff with early but incomplete signs of RSD and some symptoms of ulnar neuropathy, increased his Neurontin[4], adds Celebrex[5], and referred him to Dr. Irvin for evaluation. According to Dr. Hinton, it was necessary to check nerve studies for ulnar nerve damae and triple phase bone scan for evidence of RSD. (Tr. 255-257).  The record

---

[3]RSD, or regional pain disorder, is diffuse persistent pain associated with vasomotor disturbances, trophic changes, and limitation or immobility of joints, and usually follows an injury.  See, www.medilexicon.com.  (Last visited May 18, 2009).

[4]Neurontin is an anti-epileptic drug used to treat seizures, and also to treat nerve pain. See, www.medilexicon.com. (Last visited May 18, 2009).

[5]Celebrex is an NSAID used to treat pain or inflammation. See, www.medilexicon.com.  (Last visited May 18, 2009).

reflects that Plaintiff's triple phase bone scan and nerve studies were normal.  (Tr. 258-260).  In office notes dated February 22, 2001, Dr. Crotwell expressed the need for EMG/NCV testing to determine if Plaintiff should be prescribed sympathetic blocks. (Tr. 233).

In office notes dated March 16, 2001, reflects that Dr. Crotwell had spoken with Dr. Hinton twice, and that Dr. Hinton found nothing suggesting RSD, and that the nerve studies and the triple bone scan were completely normal.  He opined that Plaintiff's problems were more psychological.  Dr. Crotwell observed that Plaintiff had a job description for a light duty position consisting of "sweeping, dusting, sweeping the parking lot, answering the phone".  He opined that Plaintiff could return to the light duty position the following Monday, and that he could return to regular work on April 9, 2001.  He further opined that Plaintiff would be at maximum medical improvement ("MMI") on April 9, 2001. Dr. Crotwell assigned Plaintiff a 5% impairment to the upper extremity, or 3% to the person as a whole on March 14, 2001, and a 2% disability to the upper extremity, or 1% to the person as a whole on March 22, 2001.  (Tr. 232).

Plaintiff was treated by T.M. Barbour, M.D., from March 2001 to January 2003.  During Plaintiff's March 29th visit, he reported that he had been cleared for work, and had returned to work, and while sweeping, he had a pop in his elbow, followed by

9

discoloration medially and an increase in pain.  On physical exam, Dr. Barbour observed that Plaintiff had full flexion and extension of the elbow, some hypersensitivity over the olecranon, full pronation and supination, positive Tinel's[6] over the ulnar nerve at the elbow, some discoloration and ecchymosis medially over the elbow, and tenderness along the medial epicondyle.  Dr. Barbour noted that stress of the medial collateral ligament produced some pain, and that Plaintiff's hand had decreased sensation in the ulnar nerve distribution and no intrinsic atrophy or weakness.  X-rays of Plaintiff's elbow were normal.  Dr. Barbour diagnosed Plaintiff with ulnar nerve contusion left elbow with possible medial muscular tear versus collateral ligament injury. He also indicated his belief that Plaintiff  had an ulnar nerve neuropathy, but noted that a MRI scan was necessary to document the extent of injury to Plaintiffs medial elbow. (Tr. 300).

Dr. Barbour's office notes dated April 5, 2001 reflect that Plaintiff reported continued pain and was tender with subluxation of the ulnar nerve.  Dr. Barbour also noted popping and tenderness, and a positive Tinel's over the ulnar nerve.  Dr. Barbour noted that the MRI showed that Plaintiff's medial collateral ligament was intact, and that he has subluxation of the ulnar nerve out of the

---

[6]Tinel's is an examination test that is used by doctors to detect an irritated nerve.  See, www.medterms.com. (Last visited May 18, 2009).

cubital tunnel with a tear of the arcuate ligament at the flexor. He opined that Plaintiff has symptomatic subluxation of the ulnar nerve in his anterior transposition.  Dr. Barbour provided Plaintiff with a note to return to work.  Plaintiff was restricted to a desk job and was not to use his left arm until after surgery. (Tr. 299).

Dr. Barbour's office notes dated April 23, 2001 reflect that Plaintiff was status post anterior transposition of the ulnar nerve and partial medial epicondylectomy and repair of the medial snapping triceps.  Dr. Barbour noted that Plaintiff had "excellent relief of his neurological symptoms" with the surgery.  (Tr. 299). In office notes dated May 14, 2001 Dr. Barbour indicated that Plaintiff was doing well, but reported a lot of soreness in his medial elbow and occasional popping.  On exam, weakness in the triceps and medial swelling were observed.  Dr. Barbour noted that Plaintiff's ulnar nerve symptoms had abated.  He opined that Plaintiff's problems would resolve with time, and prescribed anti-inflammatories and aggressive therapy.  (Tr. 298).

Dr. Barbour's office notes dated June 4, 2001 reflect that Plaintiff was making slow improvement.  Plaintiff had motion of 0-140 degrees, but extension of the elbow was painful.  Additionally, an inflamed tight scar formation in the anterior medial elbow was noted. Dr. Barbour prescribed aggressive physical therapy, and placed Plaintiff on light duty with a five pound lifting

11

restriction.   Additionally, Plaintiff was restricted from the use
vibratory instruments and from ladder climbing.  (Tr. 298).

Dr. Barbour's office notes dated June 28, 2001 reflect that
Plaintiff's  hand  appeared  to  be  getting  worse  with  increased
numbness in his small and ring fingers.  Stiffness and tenderness
around the scar was also noted.  Plaintiff was encouraged to work
aggressively on therapy[7].  (Tr. 298).

On September 24, 2001 Dr. Barbour recommended that Plaintiff
have neurolysis and saphenous vein wrapping.  (Tr. 293).  Treatment
notes from HealthSouth Surgery Center dated October 19, 2001 show

---

[7]Plaintiff struck a door and injured his right hand.  He was
seen on July 2, 2001 by another doctor in Dr. Barbour's office,
Stephen Cope, M.D..  Plaintiff had full range of motion of the
right wrist, and no significant swelling.  Tenderness over the
mid-5th metacaroal area was noted.  The testing confirmed a
fracture of Plaintiff's mid-5th metacarpal area.  Plaintiff was
placed in a short arm case.  The July 9, 2001 office notes
reflect Plaintiff was given a return to work note and was
restricted to no use of the right hand and arm.  On July 12,
Plaintiff's restrictions were modified to include no repetitive
use of the left upper extremity. (Tr. 297).  Plaintiff reported
on July 16, 2001 that he re-injured his elbow while sweeping, and
Dr. Barbour increased his limitations to include no sweeping.
(Tr. 296).  Plaintiff's cast was removed on July 27, 2001, at
which time Plaintiff reported a little tenderness at the site of
the fracture.  Dr. Cope noted that Plaintiff had no malrotation
on the rest of the examination.  Dr. Cope further noted a
fracture gap laterally.  On follow-up on August 6, 2001, Dr. Cope
noted that Plaintiff reported no discreet tenderness at the
fracture site.  An x-ray showed that the fracture healed
medially, but that Plaintiff still had a fracture gap laterally.
Dr. Cope restricted Plaintiff to no lifting over five pounds with
his right hand.  (Tr. 295, 296).  On August 23, 2001, Dr. Cope
released Plaintiff to use his right hand with no restrictions.
(Tr. 293)

that Dr. Barbour performed a left elbow neurolysis and saphenous
vein wrapping. (Tr. 240-253). In an office note dated October 25,
2001, Dr. Barbour observed that Plaintiff continued to show
hypesthesia in the small and ring fingers, "which is subjectively
not changed," but that his motor function was intact in the
intrinsics of the hand. (Tr. 292). On November 2, 2001, Dr.
Barbour noted that Plaintiff was concerned about inflammation in
his elbow, but that the incision was healing nicely and there was
no evidence of infection. He encouraged Plaintiff to aggressively
work on range of motion. (Tr. 291).

On November 15, 2001, Dr. Barbour noted that Plaintiff had
better motion and his strength was improving, but he still
complained of clicking and spasm. On physical exam, Plaintiff's
range of motion was approximately 10-140 degrees, with normal
pronation and supination, minimal swelling medially with some
swelling. Dr. Barbour prescribed aggressive therapy for range of
motion and scar massage. On December 13, 2001, Plaintiff continued
to complain of soreness medially, intact intrinsic function, and
decreased sensation in the ulnar nerve distribution. Dr. Barbour
discontinued therapy and encouraged Plaintiff to work on range of
motion at home. (Tr. 291).

In treatment notes dated January 8, 2002, Dr. Barbour observed
that Plaintiff was continuing to have significant pain and loss of

13

extension of his elbow.  Plaintiff reported that Elavil[8] helped to relieve the pain at night. (Tr. 291).

In a letter dated January 22, 2002 to attorney Joseph Thetford, Dr. Barbour diagnosed Plaintiff with severe scarring of the ulnar nerve at the elbow, and opined against further surgical treatment because the past surgeries had not relieved his pain, nor increased his function.  He opined that Plaintiff was at maximum medical improvement.  He further opined that Plaintiff has a permanent partial impairment radiating of 23% to the upper extremity, secondary to a loss of function of the elbow and a partial nerve dysfunction.  He also opined that Plaintiff is permanently restricted from using vibratory tools, and that he cannot engage in heavy gripping, or repetitive use of his upper extremity.  He also restricted Plaintiff from lifting above five pounds with his left[9] upper extremity.  Dr. Barbour opined that in the future, Plaintiff might occasionally need physical therapy and anti-inflammatories to help with intermittent episodes of increased pain or discomfort.  Additionally, Dr. Barbour noted that Plaintiff was taking Elavil, and that the medication should not cause

---

[8]Elavil is an antidepressant used for the treatment of depression. See, www.drugs.com. (Last visited May 27, 2009).

[9]While Dr. Barbour actually wrote that Plaintiff is limited to lifting five pounds with his right upper extremity, the record as a whole, and Dr. Barbour's treatment notes in particular reflect that Plaintiff's upper extremity limitations relate to Plaintiff's left upper extremity as opposed to his right upper extremity.

functional incapacity or limitations. (Tr. 290).

Plaintiff presented to Providence Hospital emergency room on April 19, 2002. Plaintiff reported left elbow pain, which he described as aching, throbbing and constant, and also reported that his pain medication did not help. Plaintiff's hand and fingers were swollen and purple. Plaintiff underwent an upper extremity arterial examination and upper extremity venous duplex, both of which were normal. He was diagnosed with arthritis and edema in his left upper extremity, and was instructed to follow up with Dr. Barbour. (Tr. 261-274).

Dr. Barbour's office notes dated April 23, 2002 reflect that Plaintiff complained of pain and swelling in his elbow on, and was treated with anti-inflammatories and physical therapy. On July 12, 2002, Plaintiff reported increased pain in his elbow, and intermittent swelling. Dr. Barbour observed that Plaintiff had good motor function, spasms of his flexors, and that his elbow was unswollen, non-erythematous, and had no infection. Additionally, Plaintiff's nerve function was unchanged. Dr. Barbour prescribed Neurontin. (Tr. 289).

Plaintiff saw Dr. Barbour on August 16, 2002, and reported that his elbow was killing him. Dr. Barbour noted that he did not have any options at that point, and he referred Plaintiff to Dr. Ekkehard Bonatz at UAB. (Tr. 288).

15

Plaintiff was seen at the Providence Hospital emergency room on September 28, 2002.  He complained of increased left elbow pain after lifting a container of anti-freeze.  An x-ray of Plaintiff's left elbow was negative.  He was diagnosed with left elbow sprain. (Tr. 275-285).

Plaintiff was next seen by Dr. Barbour on September 30, 2002. Plaintiff reported re-injuring his elbow.  Although Plaintiff stated that his elbow was swollen, on physical exam, Dr. Barbour detected no swelling or changes from the previous exams.  (Tr. 287).

Plaintiff's wife called Dr. Barbour's office on January 24, 2003 requesting pain medications for Plaintiff.  She was informed that Plaintiff  would need to be seen before Dr. Barbour before any narcotics were prescribed.  (Tr. 287).  Plaintiff presented to Dr. Barbour on January 30, 2003.  He again reported pain in his elbow. On exam, no swelling around the medial elbow was noted, and there were no trophic changes.  Tenderness to light palpation around the elbow was observed, along with decreased sensation in the small finger. Plaintiff's intrinsic function was intact, though weak. Dr. Barbour opined that Plaintiff had "symptom magnification," and noted that he was terminating Plaintiff's care through his office because Plaintiff was threatening legal action against him.  (Tr. 286).

Plaintiff presented to Mobile Infirmary on April 15, 2003.  He

16

reported left elbow pain.  On physical exam, a deficit in tendon function is noted. Plaintiff was diagnosed with myositis[10] in the left arm and was prescribed Oxycontin[11].  (Tr. 302-307).

Cesar M. Roca, Jr., M.D., performed a consultative evaluation on June 13, 2003 at the request of the Agency[12].  On physical exam, Dr. Roca reported that Plaintiff had slight coolness to his left hand, and normal radial pulses, full range of motion to the fingers and wrist, and that extreme finger extension caused pooling into the flexor muscles and tendons on the volar aspect of the forearm. Dr. Roca further noted that Plaintiff had symmetric diameters to

---

[10]Myositis is muscular discomfort from an infection or some unknown cause.  See, www.medterms.com.  (Last visited May 27, 2009).

[11]Oxycontin is a narcotic pain reliever used to treat moderate to severe pain.  See, www.drugs.com.  (Last visited May 18, 2009).

[12]A Physical Residual Functional Capacity Assessment was completed by an Agency Specialist on April 24, 2003.  In that assessment, Plaintiff was limited to occasionally lifting/carrying up to 20 pounds, frequently lifting/carrying up to 10 pounds, and standing/walking/sitting about six hours in an eight-hour workday.  Plaintiff was limited to occasional pushing/pulling with the left upper extremities, and no pushing/pulling on the right.  Plaintiff was further limited to no climbing ladders/ropes/scaffolds, but he could frequently balance, stoop, kneel, crouch, or crawl.  His reaching in all directions was unlimited, but he was limited to occasional handling, fingering, and feeling with his left upper extremity. His right upper extremity was unlimited.  He had no visual or communication limitations, and no limitation in his ability to work in extreme cold or heat; wetness; humidity; noise; vibration; fumes; odors; dusts; gases; or poor ventilation.  He was to avoid even moderate exposure to hazards such as machinery and heights.  (Tr. 308-316).

the arms, forearms, and hands, and no atrophy to the hand at all. He also noted that although Plaintiff reported feeling no sensation at all in his left hand, there appeared to be good capillary refill.  He also noted symmetric calluses on both hands, and some callous beneath his ring on his left ring finger, indicating that he uses his hand.  Dr. Roca stated that radiographs of the left elbow AP/lateral views appeared perfectly normal, and strength on the right hand was about 100.  Plaintiff's left hand grip strength was inconsistent and varied between 12 and 40 pounds.  Dr. Roca could not identify any musculoskeletal pathology, but did not rule out the possibility of psychosomatic problems.  (Tr. 317-318).

Plaintiff was treated by Charles E. Hall, Jr., M.D., from April 7, 2003 to February 10, 2004.  Plaintiff initially underwent a consultative examination at the request of the Agency on April 7, 2003.  Dr. Hall noted significant scarring in his left upper extremity, and that it appeared to be well-healed.  He also noted marked decrease in sensation in his left hand and all digits.  He further noted hypersensation along the forearm, and grip strength that was 4/5.  He observed that Plaintiff could do fine finger movements, but it was decreased, that he had -2 degrees of full extension of the elbow and that his biceps and triceps were 4/5. Dr. Hall also noted pain on movement, and pronation and supination within normal limits.  He stated that x-rays revealed some osteoarthritic changes, but no obvious abnormality.  He diagnosed

Plaintiff with history of left upper extremity crush injury with residual pain and ulnar transposition with residual weakness and numbness in his left upper extremity.  He opined that Plaintiff was "significantly limited" with his left upper extremity secondary to numbness and pain.  He noted that Plaintiff had no ability to recognize pain sensation in his left hand, and recommended no activity with his left upper extremity.  He opined that Plaintiff had no restrictions in sitting, standing and ambulation, and that he had no restrictions for his right upper extremity.  (Tr. 322-323).

Plaintiff followed up with Dr. Hall on September 11, 2003. Plaintiff reported pain in his elbow, and that the Pamelor was not really helping.  Dr. Hall noted that Plaintiff was tender over the left elbow region, with numbness in his forearm.  Plaintiff's Pamelor dosage was increased, and he was referred to Dr. Perry Savage in Birmingham because he desired to be seen by somebody outside of Mobile.  (Tr. 321).

Plaintiff was next seen by Dr. Hall on January 19, 2004.  Dr. Hall noted that Plaintiff was treated by Dr. Savage.  Physical therapy was prescribed and it was noted that Plaintiff was on Elavil and a Lidoderm patch[13].  (Tr. 320).  During a February 10,

---

[13] Lidoderm patch is a local anesthetic used to relieve pain by blocking nerve signals. See, www.drugs.com.  (Last visited May 27, 2009).

19

2004 visit to Dr. Hall, Plaintiff reported that he was still having problems with his left elbow, and that physical therapy, Elavil and the Lidoderm patch were not helping.  On exam, Plaintiff had full extension, weakness in his biceps and hand grip, and no obvious erythema.  He was diagnosed with chronic elbow pain.  The notes reflect that Plaintiff was to be referred to Dr. Couch to see if some type of brachial plexus block would help. (Tr. 319).

On referral from Dr. Hall, Plaintiff was seen by pain specialist Xiulu Ruan, M.D., who treated Plaintiff from March 10, 2004 to January 12, 2006.  Plaintiff reported the "pop" of his left elbow, and aching, throbbing, burning, nagging pain, and placed his pain level at 8 out of 10.  Plaintiff also reported that he was not on any pain medication. (Tr. 360).

In a report of consultation dated March 10, 2004, Dr. Ruan noted that Plaintiff's physical exam was normal except for restriction in his left elbow flexion.  He also noted that the sensation in Plaintiff's upper left extremity from the elbow was grossly preserved, that the muscle bulk of Plaintiff's his left upper extremity was grossly preserved and that the left elbow surgical scar was well healed.  Dr. Ruan  noted no abnormal skin discoloration or abnormal hair pattern, and further noted that Plaintiff's left forearm and hand felt slightly colder than the right.  Neurologically, Plaintiff's motor strength exam showed "give away weakness" on the left side at biceps, triceps, wrist

extensor, finger extensor, and hand-interest muscles, possibly due to pain.

Dr. Ruan also noted a loss of sensation of left upper extremity from proximal forearm to fingers diffusely without fitting into any peripheral nerve territory. He diagnosed Plaintiff with neuropathic pain of the left upper extremity, possible complex regional pain syndrome of the left upper extremity, and traumatic arthritis of left elbow. Dr. Ruan opined that he found the physical findings "puzzling" in that Plaintiff had diffused sensory loss in his left upper extremity from the elbow down involving multiple peripheral nerves, with multiple muscle weakness in his biceps, triceps, wrist extensor, finger extensor and hand intrinsics, but had preserved muscle bulk in both the muscles and the hand intrinsic muscles. He opined that the physical findings suggested multiple nerve involvement and opined that Plaintiff has some component of complex regional pain syndrome. He prescribed methadone[14] and Gabitril[15], referred Plaintiff to Dr. Bennet for psychological evaluation, and scheduled him for a thoracic sympathetic block. (Tr.360-362).

Plaintiff returned to Dr. Ruan on March 26, 2004 and April 5,

---

[14]Methadone is a narcotic pain reliever. See, www.drugs.com. (Last visited May 27, 2009).

[15]Gabitril is an anti-epileptic medication used to treat seizures. . See, www.drugs.com. (Last visited May 27, 2009).

2004 for left thoracic sympathetic blocks at T2. Plaintiff
reported satisfactory pain relief each time. During Plaintiff's
March 26, 2004 visit, Dr. Ruan noted that Plaintiff could not
tolerate methadone, so he was switched to fentanyl patch[16]. (Tr.
356-357, 358-359). Plaintiff returned to Dr. Ruan on June 1, 2004,
and underwent a left radiofrequency thoracic sympathectomy. Dr.
Ruan noted that Plaintiff had "significant post procedure pain,"
and adjusted Plaintiff's medications, which included Avinza[17],
Lortab[18], Prozac[19], Daypro[20], Trazodone[21] and Soma[22]. (Tr. 354-355).

Plaintiff returned to Dr. Ruan on June 24, 2004, for follow-up
treatment. Plaintiff reported significant relief after the

_____

[16]Fentanyl patch is a narcotic pain medication. See,
www.drugs.com. (Last visited May 27, 2009).

[17]Avinza is a narcotic pain medication used to treat moderate
to severe pain. . See, www.drugs.com. (Last visited May 27,
2009).

[18]Lortab is a narcotic pain medication used to treat moderate
to moderately severe pain. See, www.drugs.com. (Last visited
May 27, 2009).

[19]Prozac is an antidepressant used to treat depression and
obsessive-compulsive disorder. See, www.drugs.com. (Last
visited May 27, 2009).

[20]Daypro is an NSAID used to treat inflammation, swelling,
stiffness, and joint pain. See, www.drugs.com. (Last visited
May 27, 2009).

[21]Trazodone is an antidepressant used to treat depression.
See, www.drugs.com. (Last visited May 27, 2009).

[22]Soma is a muscle relaxer. See, www.drugs.com. (Last
visited May 27, 2009).

radiofrequency thoracic sympathectomy, and described a reduction in pain from 10/10 pain to 6/10 pain. Plaintiff also reported continued swelling and color change. Dr. Ruan adjusted Plaintiff's medications. (Tr. 352-353).

In a Pain Questionnaire dated July 25, 2004, Dr. Ruan opined that Plaintiff suffers from ulnar nerve neuropathy and traumatic arthritis of the left elbow, neuropathic pain of the left upper extremity, and sympathetic maintained pain of the left upper extremity. He further opined that these conditions are confirmed by diagnostic and therapeutic left thoracic sympathetic block, therapeutic sympathectomy by radiofrequency, and nerve conduction study and EMG. He further opined that the symptoms had persisted for at least three months and were expected to last for 12 months, that Plaintiff's impairment would prevent him from working full time, and that his complaints of pain were credible. Dr. Ruan noted that Plaintiff is limited in that when he uses his left upper extremity, it "pops" and causes severe pain in an unpredictable way. Dr. Ruan opined that physical activity greatly increased Plaintiff's pain to such a degree that it caused distraction from task or total abandonment of task, and that his pain is present to such an extent as to be distracting to the adequate performance of daily activities or work. (Tr. 333-334).

Dr. Ruan also completed a Physical Capacities Evaluation on July 25, 2004. In the evaluation, he limits Plaintiff to sitting

three hours at a time and six hours total in an eight-hour workday, standing/walking two hours at a time and five hours total in an eight-hour workday, lifting five pounds continuously, ten pounds frequently, 20 pounds occasionally, and never lifting over 20 pounds, and carrying ten pounds continuously, 20 pounds frequently, twenty-five pounds occasionally, and never more than 25 pounds. Dr. Ruan also limits Plaintiff to never pushing/pulling arm controls on the left.  Dr. Ruan opined that Plaintiff is unlimited in his ability to push and pull on the right, or to grasp on the right and left.  According to Dr. Ruan, Plaintiff can use his feet for repetitive action such as pushing/pulling leg controls, and can continuously bend and squat, frequently crawl and reach, and occasionally climb.  He further indicated that Plaintiff is mildly limited in his ability to drive automotive equipment, but can work at unprotected heights, around moving machinery, in areas with marked changes in temperature and humidity and while exposed to dust, fumes and gases.  He further opined that Plaintiff's impairments had existed since October of 2003, and that Plaintiff cannot work eight hours per day, 40 hours per week on a sustained basis with these limitations.  He opined that Plaintiff's main limitation is that he suffers pain in his left elbow and left arm when using his left forearm and hand.  (Tr. 335).

Plaintiff next saw Dr. Ruan on August 16, 2004.  Plaintiff reported continued "pop" in his left elbow, with swelling and skin

discolorations, and that his spasm is better with Soma.  He also reported that his sleep is better with Trazodone and his mood is improved with Lexapro.  Plaintiff's physical exam was normal, except for mild swelling around his left elbow, healed surgical scar, and focal allodynia and dysesthesia with gentle palpation over the medial aspect of the left elbow.  Dr. Ruan noted that Plaintiff's cranial nerves were intact and his motor strength was unchanged.  Dr. Roan adjusted Plaintiff's medications, which were listed as Avinza, Lortab, Daypro, Zantac[23], NSAID's, Soma, Trazodone, Klonopin[24] and Lexapro.  (Tr. 350-351).

Plaintiff was seen by Dr. Ruan on September 14, 2004.  He reported increased pain with left elbow movement and more frequent breakthrough pain.  He also reported that his mood was better with Lexapro, and asked if he could have injections similar to radiofrequency thoracic sympathectomy, which provided him with a very good response.  His medications were adjusted.  (Tr. 348-349). On October 11, 2004, Plaintiff underwent a radiofrequency thoracic sympathectomy, which resulted in satisfactory pain relief.  (Tr. 346-347).

Plaintiff returned to Dr. Ruan on November 10, 2004.  He

_____

[23]Zantac is a medication used to reduce stomach acid.  <u>See</u>, <u>www.drugs.com.</u>  (Last visited May 27, 2009).

[24]Klonopin is used to treat certain types of seizures and for treating panic disorder.  <u>See</u>, <u>www.drugs.com.</u>  (Last visited May 27, 2009).

reported positive efficacy of his left elbow pain. According to Plaintiff, the constant nagging pain was gone, and his mood was better on Lexapro. He also reported that he could do a little more than before, and that he was experiencing episodic anxiety and phobia. On physical exam, mild swelling around the left elbow, healed surgical scar, focal allodynia, and dysesthesia with gentle palpation were noted. Dr. Roan diagnosed Plaintiff with left ulnar neuropathy with neuropathic pain of the left upper extremity, sympathetically maintained pain symptoms of the left upper extremity, depression, insomnia and associated cervical myofascial pain with spasm. Dr. Roan also adjusted Plaintiff's medications. (Tr. 344-345).

Plaintiff next saw Dr. Ruan on January 12, 2005. He reported positive efficacy of his left elbow pain, that the constant nagging pain was gone, and that his mood was better on Lexapro. He reported bruises around the left elbow, which migrate to other parts of the left upper extremity. He also reported that when his elbow pops, it becomes swollen, cold and painful, and that he notices discoloration on the lateral side. On physical exam, Plaintiff had mild swelling around the left elbow, healed surgical scar, focal allodynia, and dysesthesia with gentle palpation of the left elbow. Dr. Roan diagnosed Plaintiff with left ulnar neuropathy with neuropathic pain of the left upper extremity, sympathetically maintained pain symptoms of the left upper

26

extremity, depression, insomnia and cervical myofascial pain with spasm.  He also adjusted Plaintiff's medications.  (Tr. 342-343).

Plaintiff was seen by Dr. Ruan on February 14, 2005, and upon physical exam, Dr. Raun's diagnosis was the same. P l a i n t i f f underwent a left radiofrequency thoracic sympathectomy on March 8, 2005. Dr. Roan noted that Plaintiff tolerated the procedure well. (Tr. 338-341). Dr. Ruan's March 16, 2005 treatment notes reflect positive efficacy of Plaintiff's left elbow pain.  Plaintiff reported that the constant nagging pain was gone, and that his mood was better on Lexapro.  On physical exam, Dr. Ruan's diagnosis remained the same. (Tr. 336-337).

Plaintiff was seen by Dr. Ruan on April 13, 2005, and reported increased anxiety due to his son's diagnosis of leukemia.  He again reported that the constant nagging pain in his left elbow was gone, and that his elbow still pops, but with less frequency.  He also reported that sometimes his left elbow becomes swollen, cold and painful, and that he sometimes loses sensation in his left hand and forearm.  Plaintiff stated that his mood is better on Lexapro, and that he is able to do a little more than before.  On physical exam, Dr. Ruan's diagnosis remained the same. (Tr. 416-417).

During Plaintiff's May 24, 2005 visit, Plaintiff reported to Dr. Raun that his elbow popped out again the previous week-end, and he had increased pain in his elbow, extending into his hand.  He also reported that he loses sensation in his left hand and forearm.

27

On physical exam, Dr. Ruan's diagnosis remained the same. (Tr. 414-415).

Plaintiff returned to Dr. Ruan on October 20, 2005. He reported increased pain up toward his left axilla. He further reported that when his elbow pops, it becomes swollen, cold and painful, and that he notices discoloration on the lateral side. Dr. Roan diagnosed Plaintiff with left ulnar neuropathy with neuropathic pain of the left upper extremity, sympathetically maintained pain symptoms of the left upper extremity, depression, insomnia and opioid dependence. He adjusted Plaintiff's medications and submitted a new claim for a radiofrequency thoracic sympathectomy. (Tr. 418-419).

Plaintiff was seen by Dr. Ruan on November 15, 2005. He reported a nodule like skin change around his medial left elbow, and that his elbow continues to pop. On physical exam, Plaintiff had mild swelling around the left elbow, healed surgical scar, focal allodynia, and dysesthesia with gentle palpation of the left elbow. Dr. Roan diagnosed Plaintiff with left ulnar neuropathy with neuropathic pain of the left upper extremity, sympathetically maintained pain symptoms of the left upper extremity, depression, insomnia and opioid dependence. He adjusted Plaintiff's medications. (Tr. 432-433).

Plaintiff's next visit to Dr. Ruan was on December 15, 2005. Plaintiff reported that pressing down with his left digits results

28

in severe shooting pain from his elbow to his axilla.  He also relayed the same complaints about his elbow popping.  Dr. Raun examined Plaintiff.  His diagnosis remained he same. (Tr. 430-431).  Plaintiff's January 12, 2006 visit also resulted in the same diagnosis. (Tr. 428-429).

The record also contains a Residual Physical Functional Capacity Assessment that was completed by an Agency physician on April 30, 2004.  In the assessment, the Agency physician opined that Plaintiff is limited to occasionally lifting/carrying up to 50 pounds, frequently lifting/carrying up to 25 pounds, and standing/sitting/walking about six hours in an eight-hour workday.  The physician also opined that Plaintiff is limited to occasional pushing/pulling hand controls with his left upper extremity, and is also limited to never climbing ladders, ropes or scaffolds, occasionally crawling, and frequently climbing ramps and stairs, balancing, stooping, kneeling, and crouching.  The physician also opined that Plaintiff's ability to handle or finger with his left upper extremity is limited, and that Plaintiff is unlimited in his ability to reach and feel with his right upper extremity.  The physician further opined that Plaintiff can frequently climb, balance, stoop, kneel and crouch, and has no visual, communicative or environmental limitations.  (Tr. 324-329).

Plaintiff was also evaluated by Todd D. Elmore, M.D., on September 12, 2005 at the request of the Agency.  In his report,

Dr. Elmore observed that Plaintiff's physical exam was normal except for weakness in all the muscles in his left upper extremity for approximately 4/5, and that Plaintiff gave poor effort. He further noted that Plaintiff had quite a bit of pain with motor testing of the left arm. Dr. Elmore diagnosed Plaintiff with left elbow injury with three subsequent surgeries, subsequent left arm pain with a diagnosis of complex regional pain syndrome, and significant subjective numbness and weakness of the left arm. (Tr. 421-423).

Dr. Elmore completed a Physical Capacities Evaluation on the same day. He opined that Plaintiff is limited to sitting/standing/walking six hours at a time, and standing/walking six hours and sitting eight hours total in an eight-hour workday. He further limited Plaintiff to lifting ten pounds continuously, 20 pounds frequently, 25 pounds occasionally, and never more than 25 pounds. He opined that Plaintiff cannot grasp, push/pull with arm controls, or do fine manipulation with his left hand, but can do so with his right hand, and that he can bend, squat and reach frequently, but cannot crawl or climb at all. He restricted Plaintiff from activities involving unprotected heights, exposure to marked changes in temperature and humidity, and exposure to dust, fumes and gases. He also opined that Plaintiff is mildly restricted from being around moving machinery and driving automotive equipment. Dr. Elmore noted that all of the limitations

were based on Plaintiff's subjective pain reports.  (Tr. 424).

Plaintiff underwent a psychological examination by Michael S. Rosenbaum, Ph.D., at the request of his attorney on February 6, 2006.  Dr. Rosenbaum diagnosed Plaintiff with major depressive disorder, single episode and adjustment disorder with anxiety, and assigned him a GAF of 50[25].  Dr. Rosenbaum observed that it is "questionable" whether Plaintiff can sustain his performance in a work setting for a reasonable period of time, and noted Plaintiff's depression, anxiety, fatigue, difficulty concentrating, interpersonal problems, and health-related problems.  (Tr. 439).

Dr. Rosenbaum completed a Mental Residual Functional Capacity Questionnaire on February 6, 2006.  He opined that Plaintiff is mildly restricted in his activities of daily living, markedly restricted in his ability to maintain social functioning, and moderately restricted in concentration, persistence, or pace such that he is unable to complete tasks in a timely and appropriate manner.  He also opined that Plaintiff has never had an episode of decompensation.  Dr. Rosenbaum further indicated that Plaintiff is moderately limited in his ability to understand, carry out and remember instructions, and mildly limited in his ability to respond

---

[25]The Global Assessment of Functioning Scale is a 100-point scale that measures a patients overall level of psychological, social, and occupational functioning on a hypothetical continuum. A GAF of 41-50 indicates severe symptoms or any serious impairment in social, occupational or school functioning.  See, www.psyweb.com.  (Last visited May 20, 2009).

appropriately to supervision and co-workers, and in his ability to perform simple and repetitive tasks. He further opined that Plaintiff is markedly limited in his ability to respond appropriately to customary work pressures. Dr. Rosenbaum also opined that these limitations have lasted or can be expected to last at least 12 months, that drug/alcohol abuse is not a contributing factor material to these limitations, that a psychological evaluation was obtained, and that the earliest date these limitations apply is 2001. (Tr. 440-443). **Start here**

> **1.  Whether the ALJ erred in failing to assign determinative weight to the opinions of Plaintiff's treating physician, Dr. Ruan.**

Plaintiff argues that the ALJ erred in failing to assign determinative weight to the opinions of Dr. Ruan, as they were consistent with the medical record. Defendant argues that Dr. Ruan's opinions are not supported by the other evidence in the record, including Dr. Ruan's own office notes; therefore, the ALJ did not err in failing to assign determinative weight to Dr. Ruan's opinions.

In his opinion, the ALJ made the following findings:

[T]hrough June 30, 2006, the date last insured, the claimant had the residual functional capacity to sit at least two hours at a time and at least six hours total in an entire eight-hour workday and stand/walk at least two hours at a time and up to six hours total in an entire eight-hour workday. The claimant could lift/carry no more than five pounds with his left upper extremity and frequently lift/carry 10 pounds and occasionally up to 20

pounds with his right upper extremity. The claimant had no restrictions or limitations to his right upper extremity but because of left elbow ulnar nerve scarring and pain symptomatology he could not use his left upper extremity for any repetitive movements; he could occasionally perform fine and gross manipulation with his left hand and occasionally use his left upper extremity for reaching. Because of limitations to his left upper extremity and pain symptomatology the claimant was limited to never sweeping, never climbing ladders, ropes, and/or scaffolds and was totally restricted from unprotected heights, exposure to hazardous machinery, and using vibratory tools...................................

Controlling weight cannot be assigned to the July 2004 opinion of Dr. Ruan and the limitations he placed on the claimant's functional capacity because other objective evidence, including Dr. Ruan's own treatment notes, support a different conclusion. . . . For instance, one month before Dr. Ruan offered his opinion concerning the claimant's physical abilities the claimant reported "significant relief" following a series of injections as well as decreased pain. The claimant further reported that the "popping" of his elbow was less frequent and less painful. In fact, Dr. Ruan commented that because of improvement experienced by the claimant it was not necessary at that time to schedule another injection. The month following Dr. Ruan's functional capacity assessment, the claimant reported only intermittent popping of his elbow, improved sleep, and improvement in his mood. Physical examinations in both June and August 2004 were unremarkable with the exception of only the claimant's left upper extremity. Furthermore, Dr. Ruan's physical capacities evaluation is internally inconsistent in that he placed no limitation on the claimant's ability to frequently reach or crawl, which requires weight bearing and/or repetitive use of the upper extremities. Despite having opined that the claimant experienced constant and distracting pain, Dr. Ruan opined that the claimant had no restriction from activities at unprotected heights or exposure to moving machinery. It is only reasonable that someone distracted by pain should be totally restricted from those activities. Dr. Ruan also placed only a mild restriction on the claimant's ability to drive automotive equipment. The same reasoning applies to this activity as to that of

> unprotected heights and hazardous machinery.  It is only
> reasonable that, if the claimant was really as limited by
> pain as alleged, that Dr. Ruan would have encouraged him
> to surrender his driver's license or, at a minimum, stop
> endangering his young daughter by driving her to and from
> school every day.....................................
>
> In further support of not assigning controlling weight to
> Dr. Ruan's opinion is that just three months earlier the
> State   Agency   medical   consultants   and   disability
> specialists determined that there was no evidence that
> the claimant even had a "severe" mental impairment.

(Tr. 17-19).  In assigning substantial weight to the opinion of

State Agency examining physician Dr. Elmore, the ALJ stated as

follows:

> Substantial weight is assigned to the report and opinion
> of Dr. Elmore because they are not inconsistent with the
> majority of other objective evidence.  Moreover, Dr.
> Elmore's opinion concerning the claimant's functional
> abilities was based on the claimant's medical records,
> including   radiological   studies,   and   the   claimant's
> subjective pain complaints.

(Tr. 28).

Case law provides that the opinion of a treating physician

"must be given substantial or considerable weight unless 'good

cause' is shown to the contrary."  "Good cause" exists where: 1)

the opinion was not bolstered by the evidence; 2) the evidence

supported a contrary finding; or 3) opinion was conclusory or

inconsistent with the doctor's own medical records.  Phillips v.

Barnhart, 357 F.3d 1232, 1340-41 (llth Cir. 2004); See also Lewis

v. Callahan, 125 F.3d 1436, 1439-1441 (11th Cir. 1997); Edwards v.

34

Sullivan, 937 F.2d 580, 583 (11th Cir. 1991); Sabo v. Commissioner of Social Security, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); and 20 C.F.R. § 404.1527(d). See also Johnson v. Barnhart, 2005 WL 1414406, *2 (11th Cir. Jun. 17, 2005); Wind v. Barnhart, 2005 WL 1317040, *6 (11th Cir. Jun. 2, 2005) (citing to Crawford v. Comm'r of Social Security, 363 F.3d 1155, 1159 (11th Cir. 2004)) Johnson, 2005 WL 1414406, *2; Wind, 2005 WL 1317040, *6.

"The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error[;]" likewise, he commits error if he substitutes his own uninformed medical evaluations for those of a claimant's treating physicians absent good cause. (Id.) Of course, it is the ALJ's duty, as finder of fact, to choose between conflicting evidence and he may reject the opinion of any physician when the evidence supports a finding to the contrary. (Id.) (citing to Landry v. Heckler, 782 F.2d 1551, 1554 (11th Cir. 1986) and Bloodsworth v. Bowen, 703 F.2d 1233, 1240 (11th Cir. 1983).[26]

_____

[26]See also Blake v. Massanari, 2001 WL 530697, *10 n.4 (S.D. Ala. Apr. 26, 2001); 20 C.F.R. § 404.1527(d)(2). The Eleventh Circuit has repeatedly made clear that the opinion of a treating physician must be given substantial weight unless good cause is shown for its rejection. See, e.g., Lamb v. Bowen, 847 F.2d 698, 703 (11th Cir. 1988); Walker v. Bowen, 826 F.2d 996, 1000 (11th Cir. 1987); Sharfarz v. Bowen, 825 F.2d 278, 279-80 (11th Cir. 1987); Schnorr v. Bowen, 816 F.2d 578, 581 (11th Cir. 1987); McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986); Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir. 1984); and 20 C.F.R. § 404.1527(d)(2).

Based upon a careful review of the record, the undersigned finds that substantial evidence supports the ALJ's decision not to assign substantial weight to the opinions of Dr. Ruan.  A review of the relevant medical records reveals that Dr. Ruan's opinions are not supported by the evidence and are inconsistent with his own treatment records.  The record evidence is replete with the treatment notes and opinions of other treating and examining physicians that contradict Dr. Ruan's opinions, and support the ALJ's determination.  For instance, Dr. Crotwell, the orthopedic surgeon who performed the initial surgery on Plaintiff's left elbow in November of 2000, and then a second surgery on his left elbow in April 2001, ordered an upper extremity venous evaluation and upper arterial evaluation in February of 2001, after Plaintiff reported persistent pain.  Both tests resulted in findings which were essentially normal.  (Tr. 235-238).  Dr. Crotwell referred Plaintiff to Dr. Hinton, who ran nerve studies and a triple phase bone scan, all of which also resulted in normal findings, and caused Dr. Crotwell to conclude that Plaintiff's problem was not ulnar nerve or RSD.  (Tr. 232).

Dr. Barbour, an orthopedic surgeon with a specialty in hand surgery, performed an anterior transposition of the ulnar nerve and partial medial epicondylectomy and repair of the medial snapping triceps on Plaintiff in April 2001.  Following the procedure, Dr. Barbour reported "excellent relief of [Plaintiff's] neurological

36

symptoms." (Tr. 299). In August 2001, Dr. Barbour released Plaintiff to go back to work and limited him to light duty – lifting up to five pounds and no vibratory instruments or ladder climbing, and no sweeping and repetitive use of his left arm. (Tr. 293, 294). In September 2001, when Plaintiff continued to complain of elbow pain, Dr. Barbour performed a left elbow neurolysis and saphenous vein wrapping (Tr. 240-253), and in January 2002, Dr. Barbour permanently restricted Plaintiff to no use of vibratory tools, no heavy gripping, no repetitive use of his upper extremity, and no lifting above five pounds with his left upper extremity[27]. (Tr. 290). Later, Dr. Barbour commented that he was out of options with respect to Plaintiff's continuous report of left elbow pain, and in January 2003, Dr. Barbour concluded that Plaintiff had "symptom magnification." (Tr. 286).

Additionally, orthopedist Dr. Roca's June 2003 consultative evaluation revealed that Plaintiff's left hand had normal radial pulses, full range of motion in his fingers and wrist, symmetric diameters in his arms, forearms, and hands, and no atrophy to his left hand. Dr. Roca also noted that Plaintiff reported no sensation at all in his left hand, but he had good capillary

---

[27]As noted supra, while Dr. Barbour states that Plaintiff is limited to lifting five pounds with his right upper extremity, the record as a whole and Dr. Barbour's treatment notes in particular reflect that Plaintiff's upper extremity limitations are with the left upper extremity.

refill. Dr. Roca observed symmetric calluses on both hands, some beneath Plaintiff's ring on his left ring finger, which indicated some use of his left hand. Dr. Roca also observed that the radiographs on the left elbow AP/lateral appeared "perfectly normal," and that the strength in Plaintiff's right hand was about 100, but the strength on the left was inconsistent at between 12 and 40 pounds. (Tr. 317-318). He noted that "[t]here is no specific musculoskeletal pathology that I can define," and recommended aggressive range of motion, strength and flexibility exercises which Plaintiff can perform on his own. (Tr. 318).

Dr. Hall, who evaluated Plaintiff at the request of the Agency, and briefly treated him, opined that Plaintiff should have no activity with his left upper extremity, and that Plaintiff is not limited with respect to sitting, standing and ambulation. He also opined that Plaintiff had no restrictions with respect to his right upper extremity. (Tr. 322-323).

Finally, Dr. Elmore examined Plaintiff and observed that Plaintiff's exam was normal, except for weakness in all muscles in his left upper extremity. He also observed that Plaintiff had normal tone and no atrophy or fasciculations, and that he put forth "poor effort." In a Physical Capacities Evaluation, Dr. Elmore limited Plaintiff to sitting/standing/walking six hours at a time and sitting/standing six hours and walking eight hours total in an eight-hour workday, and to lifting ten pounds continuously, 20

pounds frequently, and 25 pounds occasionally, but never lifting more than 25 pounds.  He also restricted Plaintiff's use of his left hand for any grasping, pushing, pulling, or manipulating, and opined that Plaintiff is unrestricted with his right hand and arm. (Tr. 424).  The reports of these examining and treating physicians are fully supportive of the functional limitations adopted by the ALJ.  In limiting Plaintiff to lifting no more than five pounds with his left extremity, the ALJ adopted the permanent limitation established by Dr. Barbour who provided extensive treatment to Plaintiff.

Moreover, the medical records reflect that Plaintiff experienced relief from the constant pain in his left arm in April 2001 when he underwent an anterior transposition of the ulnar nerve and partial medial epicondylectomy and repair of the medial snapping triceps[28].  The records reflect that he likewise reported "satisfactory pain relief" when he underwent the left thoracic sympathetic blocks in March and April of 2004, and "significant relief" after radiofrequency thoracic sympthectomy.  In fact, in November of 2004, Plaintiff reported that the constant nagging pain was gone and that he could do more, a report he repeated over the next five months.  (Tr. 336, 340, 342, 344).  These records provide

_____

[28]Dr. Barbour's notes state that Plaintiff had "excellent relief of his neurological symptoms with the surgery" (Tr. 299), and that "the ulnar nerve symptoms have abated."  (Tr. 298).

substantial support for the ALJ's decision to reject Dr. Ruan's evaluation, including his opinion that physical activity would greatly increase Plaintiff's pain to such a degree that it would cause distraction from task or total abandonment of task. It is also noteworthy, as found by the ALJ, that Dr. Ruan's opinions were inconsistent with his own treatment notes. For instance, Dr. Ruan opined that Plaintiff was limited to sitting three hours at a time and six hours in an eight hour workday; however, a searching review of his treatment records fail to reveal any entries which suggest that Plaintiff was experiencing any problems sitting, walking or standing. Additionally, Dr. Ruan's opinion that Plaintiff was experiencing pain to such an extent to be distracting to the adequate performance of daily activities or work is not consistent with his findings in November of 2004, that Plaintiff reported that the constant nagging pain was gone and that he could do more.

In sum, a review of the relevant medical records reflects that the ALJ had good cause to disregard Dr. Raun's opinions because they are not consistent with either the record medical evidence or Dr. Raun's treatment notes. Thus, substantial evidence supports the ALJ's decision not to assign substantial weight to the opinions of Dr. Ruan.

**Conclusion**

For the reasons set forth, and upon consideration of the administrative record and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner of Social Security, denying Plaintiff's claim for period of disability and disability insurance benefits, is due to be **AFFIRMED.**

**DONE** this the **22**nd day of **September, 2009.**

          _____/s/ SONJA F. BIVIN_____
          **UNITED STATES MAGISTRATE JUDGE**